# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RALF FAHRENBACH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:23-cv-11029-WGY |
| v. | ) | |
| | ) | |
| GREEN PLANT MOVERS, LLC., and | ) | |
| PERENNIAL VAN LINES, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Ralf Fahrenbach, ("Mr. Fahrenbach"), by and through his attorneys James M. Vant of Greenberg Traurig and Samantha Brown and Andrew Brown of Polaris Law Group, and for his Complaint against Green Planet Movers LLC and Perennial Van Lines, LLC, alleges as follows:

## PARTIES

1.   Plaintiff, Ralf Fahrenbach, ("Mr. Fahrenbach") is an individual who resides in West Barnstable, Massachusetts. His address is 85 Salten Point Rd., Barnstable, Massachusetts 02668.

2.   Defendant, Green Planet Movers LLC, ("Green Planet") is a Colorado Limited Liability Company with a principal office address of 14800 E 35 Place, #600, Aurora, Colorado 80011.

3.   Green Planet is registered in the state of Colorado with registered agent offices at 14800 E 35 Place, #600, Aurora, Colorado 80011.

4.   Defendant, Perennial Van Lines, LLC ("Perennial") is a Florida Limited Liability Company with a principal office address of 100 E Linton Blvd, #200A, Delray Beach, Florida 33483.

5.   Perennial is registered in the state of Florida with registered agent offices at 100 E Linton Blvd, #200A, Delray Beach, Florida 33483.

6.   Mr. Fahrenbach is bringing these claims against Green Planet and Perennial for misrepresentations made to him to induce him to enter into business relations with them as well as for damages that Green Planet and Perennial caused him as a result of the cross-country move which they performed.

## JURISDICTION AND VENUE

7.  This Court has original subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and 49 U.S.C. § 14706 ("the Carmack Amendment").

8.  This Court has supplemental subject matter jurisdiction over this matter under 28 U.S.C. § 1367.

9.  This Court has personal jurisdiction over Defendant Perennial based on the contract between Plaintiff and Defendant Perennial which was entered into in the state of Massachusetts, the move which ended in the state of Massachusetts and which Defendant Perennial arranged, and the contacts which Defendant Perennial created in the state of Massachusetts through its advertising campaigns and misrepresentations made in the state to a resident of the state.

10. This Court has personal jurisdiction over Defendant Green Planet based on the move which ended in the state of Massachusetts and tortious actions of Green Planet in the state of Massachusetts.

11. Venue is proper in this Court under Paragraph 20 of Exh. 1 ("Binding Moving Estimate") as cited in paragraph 10 of this Amended Complaint.

## FACTUAL ALLEGATIONS

### Planning Mr. Fahrenbach's Move

12. In spring of 2022, Mr. Fahrenbach planned a move from 209 Headquarters Trail, Santa Fe, New Mexico 87506 ("Santa Fe Property") to a farm owned by Mr. Fahrenbach at 245 Willow St, West Barnstable, Massachusetts 02668 ("West Barnstable Property").

13. Mr. Fahrenbach found Perennial online while searching for a company to move his personal property from the Santa Fe Property to the West Barnstable Property.

14. Perennial is a Florida Limited Liability Company that is in the business of acting as a brokerage which connects people who are moving with companies that can proceed with a cross-country move.

15. Mr. Fahrenbach was unaware at the time that Perennial is not a moving company but a brokerage company.

16. Perennial has an ad via Consumer Affairs related to "long-distance movers."

17. The title line of Perennial's ad is "Perennial Van Lines – Top Long Distance Movers 2023."

18. Perennial's advertising implies that it is a moving company.

19. On Perennial's website, on its homepage, the "What We Offer" section indicates that Perennial offers "Moving + Relocation + Storage."

20. Perennial's website states "Let us help move you to a place that moves you" and "We will pack your items in a manner that guarantees their safety" and other similar statements.

21. Perennial's website states "You can always count on us to coordinate the process, pack your items, transport them and upon arriving at your destination, unpack and arrange your new home without breaking or destroying any valuables."

22. Under "Services," Perennial's website lists "Residential Moving" as a service provided.

23. One has to read the website very carefully to determine that Perennial is a broker and not a mover itself.

24. Mr. Fahrenbach's first language is German.

25. In spring 2022, Mr. Fahrenbach did not understand the difference between a mover and a broker.

26. Mr. Fahrenbach conducted extensive research on moving companies.

27. Based on the statements above, Mr. Fahrenbach contacted Perennial to receive a moving quote in early May 2022.

28. Mr. Fahrenbach relied upon the statement on Perennial's website: "We simply assign a personal moving coordinator to each client. Of course, it is the duty of the coordinator to ensure that the belongings of the client are treated with care and that the entire process goes on smoothly," when making his decision to hire them.

29. In early May 2022, Mr. Fahrenbach provided Perennial, along with other potential moving companies, with detailed photos and listings of all of the items which would be moved.

30. Mr. Fahrenbach also hired specialized movers to handle artwork and wine, so he wanted to ensure that a potential moving company could go around these items and not damage or move them.

31. Mr. Fahrenbach also wanted to organize things sequentially, so that in particular the art movers would have the space to do their unhanging, packing, crating and loading without interference from the furniture movers.

32. Over the course of several days, Mr. Fahrenbach sent Perennial via email a complete inventory of his Santa Fe home's contents in sixty-four photos in forty batches, several videos, and, ultimately, a list of a total of four hundred seventy-three individual pieces.

33. After sending the images to Perennial, Mr. Fahrenbach did a "virtual tour" with a Perennial representative going through each room in the house, the items to be moved and not to be moved, the size and space of each, and other details that would help create a moving estimate, answering all questions the representative had.

34.   Mr. Fahrenbach had several phone calls and emails with the representatives of Perennial to clarify the itemization of furniture and pieces which would and would not be moved, as well as details of the moving process.

35.   Mr. Fahrenbach was meticulous in outlining all items to be moved to ensure that there would be no question about the number or volume of his property to be moved.

36.   Mr. Fahrenbach has many expensive and irreplaceable pieces of art and furniture, which increased the care he took to ensure his movers fully understood what he expected from the move.

37.   Mr. Fahrenbach had a call with two Perennial representatives in which they had questions regarding the logistics of access to the Santa Fe Property.

38.   Mr. Fahrenbach had the Perennial representative pull up Google maps and walked them through the layout of his property and the surrounding homeowners association area.

39.   When Perennial asked Mr. Fahrenbach if semi-trucks could access his property or if shuttles would be needed, Mr. Fahrenbach honestly replied that other semi-trucks had successfully accessed his property, but it requires a specific approach. Mr. Fahrenbach provided detailed instructions.

40.   On May 7, 2022, Mr. Fahrenbach sent Perennial a final email with a complete list of the items to be moved and not to be moved ("May 7 List"). The May 7 List included 473 individual pieces and 131 items.

41.   Perennial suggested several times that the packing and loading of the items on Mr. Fahrenbach's list all occur in a single day.

42.   Mr. Fahrenbach insisted on dedicating at least one day to packing the items on the list and one full day to their loading.

43.   At no time up to this point did Perennial correct Mr. Fahrenbach's statements made indicating his assumption that they would be the ones packing for him.

44.   At no time up to this point did Perennial correct Mr. Fahrenbach's statements made indicating his assumption that they would be the ones physically performing the move.

45.   On May 9, 2022 at 8:02 p.m., Perennial sent Mr. Fahrenbach a Binding Moving Estimate ("Binding Moving Estimate") for $32,873.00. Exh. 1 at "Relocation Estimate".

46.   At 8:09 p.m., Mr. Fahrenbach informed Perennial that the most updated inventory had 131 items and 473 pieces, not 77 items and 293 pieces.

47.   He asked for verification the estimate was based on the same list.

48.   Mr. Fahrenbach and a different Perennial representative than his previous contact spoke on the phone.

49.    The Perennial representative verified they had the May 7 list, but the earlier list had been attached by mistake.

50.    The Perennial representative assured Mr. Fahrenbach that he could sign the Binding Moving Estimate and the May 7 List was incorporated.

51.    The Perennial representative assured Mr. Fahrenbach the volume, rate, and estimate were all based on the larger May 7 list.

52.    Based on these representations, Mr. Fahrenbach signed and verified the Binding Moving Estimate and paid the down payment of $9,642.61.

53.    Based on these representations, Mr. Fahrenbach chose Perennial over other qualified moving companies.

54.    The Binding Moving Estimate was a binding contract which outlined the cost and timeline for Mr. Fahrenbach's out-of-state move. Exh. 1.

55.    The Binding Moving Estimate incorporated the agreement that one day (Monday, May 16, 2022) would be devoted to packing and another (Tuesday, May 17, 2022) would be devoted to loading. Exh. 1 at "Understanding Your Estimate."

56.    The Binding Moving Estimate estimated the move at 20,319 pounds, priced at $1.00 per pound. Exh. 1 at "Relocation Details".

57.    The Binding Moving Estimate estimated the move at 2,903 cubic feet. Exh. 1 at "Relocation Details".

58.    The Binding Moving Estimate also included fuel surcharges, a binding estimate fee, full packing costs, and the cost of moving two ATVs. Exh. 1 at "Relocation Estimate."

59.    The Binding Moving Estimate stated that Perennial would provide at least four members of a packing/loading team. Exh. 1 at "Understanding Your Estimate."

60.    The Binding Moving Estimate stated that Perennial would provide "Professional Door to Door Service." Exh. 1 at "Understanding Your Estimate."

61.    The Binding Moving Estimate stated that Perennial would provide "expert advice and guidance through the course of your move." Exh. 1 at "Understanding Your Estimate."

62.    The Binding Moving Estimate stated that Perennial would include "wrapping of all furniture with quilted moving blankets." Exh. 1 at "Understanding Your Estimate."

63.    The Binding Moving Estimate stated that Perennial would include "no charge for packing tape and moving pads." Exh. 1 at "Understanding Your Estimate."

64.    The Binding Moving Estimate stated that Perennial would provide "packing of fragile/delicate items (such as TVs, glass, etc.); packing and crating services not already

listed within proposal; loading of bulky items (such as a motorcycle)." Exh. 1 at "Understanding Your Estimate."

65. The Binding Moving Estimate stated that "For full packing service: Perennial Van Lines, LLC will arrange to provide all labor and materials to professionally pack all boxes, fragile items, and furniture listed." Exh. 1 at "Understanding Your Estimate."

66. The Binding Moving Estimate stated that if items were a different volume or weight from this agreement, the mover had to provide Mr. Fahrenbach with a revised estimate and obtain his signature (with which Perennial would assist) *prior* to beginning services. Exh. 1 at "Understanding Your Estimate."

67. The Binding Moving Estimate stated that if Mr. Fahrenbach did not sign the mover's revised estimate and the mover loaded the truck, the mover had reaffirmed the original estimate and would not receive additional payment. Exh. 1 at "Understanding Your Estimate."

68. The Binding Moving Estimate required Mr. Fahrenbach to blindly agree to terms and conditions of a transporting motor carrier prior to ever seeing those terms or knowing who the transporting motor carrier would be. Exh. 1 at ¶ 3.

69. The Binding Moving Estimate indicated that Perennial would enter into a contract with a mover for the move. Exh. 1 at ¶ 7.

70. Also on May 9, 2022, Perennial provided Mr. Fahrenbach an Auto Transport Estimate for $1,900.

71. The Auto Transport estimate was to transport Mr. Fahrenbach's 2021 Toyota 4Runner from the Santa Fe Property to the West Barnstable Property.

72. Mr. Fahrenbach signed the Auto Transport Estimate and paid Perennial a down payment of $200.00.

73. Mr. Fahrenbach attempted to contact Perennial for clarification on the Binding Moving Estimate on May 10.

74. Perennial stopped answering Mr. Fahrenbach's phone calls after he signed the Binding Moving Estimate.

75. After May 9, Perennial contracted Green Planet to perform the move at the price stated and according to the timeline provided in the Binding Moving Estimate.

76. Defendant Green Planet is a Colorado Limited Liability Company that, upon information and belief, is in the business of providing moving services.

77. Upon information and belief, Perennial sent Green Planet the Binding Moving Estimate as part of Green Planet receiving the moving contract from Perennial.

78.    Based on the representations of Perennial to Mr. Fahrenbach to induce him to sign the Binding Moving Estimate, Perennial had agreed to provide the mover all of the photos, videos, correspondences, and the May 7 List to Green Planet prior to the move.

79.    Perennial did not notify Mr. Fahrenbach of the identity of the actual moving company prior to the scheduled move date of May 16

80.    Up until May 16, Mr. Fahrenbach still reasonably and mistakenly believed that Perennial would be handling the packing and the move themselves.

81.    Perennial did not provide Mr. Fahrenbach with a contact other than a telephone number connected to an answering machine rather than a person for his move if issues arose.

82.    Mr. Fahrenbach scheduled the moving of his wine for Wednesday, May 18 based on the representations of Perennial.

83.    Mr. Fahrenbach scheduled the moving of his artwork for Thursday, May 19 based on the representations of Perennial.

### Packing Mr. Fahrenbach's Belongings

84.    Mr. Fahrenbach was ready and waiting for Perennial starting at 7:30 a.m. on Monday, May 16, 2022 at his residence in New Mexico.

85.    Mr. Fahrenbach had not been contacted beforehand about the expected time of arrival of the moving truck and personnel at his home.

86.    Hours passed in which Mr. Fahrenbach attempted calling Perennial to determine where the movers were. Perennial did not respond.

87.    At or before noon, Mr. Fahrenbach received a call at an unidentified number. As he believed this was Perennial, he answered.

88.    Mr. Fahrenbach noted that the caller was an angry male who did not identify himself.

89.    The caller stated that the driver of the moving truck had been trying to reach Mr. Fahrenbach for hours and could not find his house.

90.    The caller did not identify himself as the driver, Perennial, or any other company.

91.    Mr. Fahrenbach was shocked and temporarily stunned into silence by the accusations and tone which were used by the caller.

92.    Notwithstanding this and once recovered, Mr. Fahrenbach attempted to assist in clarifying information to help the driver arrive.

93.    Shortly after this call, the driver arrived in an unmarked eighteen-wheeler.

94.     The driver felt uncomfortable with the instructions for how to drive into Mr. Fahrenbach's property, so he left the trailer of the eighteen-wheeler parked outside the homeowners' association and drove to Mr. Fahrenbach's home in the tractor portion of the truck.

95.     The driver introduced himself as Dwayne ("Dwayne") to Mr. Fahrenbach.

96.     Dwayne began lambasting Mr. Fahrenbach over his failure to answer his phone.

97.     Upon Mr. Fahrenbach's request, Dwayne checked the number he had been calling, which turned out to be an incorrect number and different than the number Mr. Fahrenbach had provided to Perennial.

98.     Dwayne did not apologize to Mr. Fahrenbach.

99.     Dwayne did not state the company for which he worked.

100.    Mr. Fahrenbach assumed that Dwayne worked for Perennial.

101.    Dwayne did not provide Mr. Fahrenbach any paperwork at this time.

102.    One other man was with Dwayne to assist with the move.

103.    The other man did not state the company for which he worked either.

104.    The other man had no driver's license, but was there to help pack.

105.    No other people, aside from Dwayne and the other man, were in the truck or arrived after.

106.    Dwayne walked around Mr. Fahrenbach's home with him, lamenting that there were more items to be packed and moved than he was expecting.

107.    Mr. Fahrenbach noticed that the lamenting began immediately upon crossing the threshold, almost before Dwayne had gotten to see any of Mr. Fahrenbach's property.

108.    The comments felt to Mr. Fahrenbach like a practiced and rehearsed routine.

109.    When Mr. Fahrenbach mentioned the list, photos, videos, and other notes, Dwayne said no one had given him any of that.

110.    Dwayne did not state what he had been provided or expected when asked.

111.    Dwayne did not mention during this walk-through any additional fees or paperwork.

112.    Dwayne did not state that a new estimate would be required.

113.    Dwayne then told Mr. Fahrenbach that he now had to hire a packing team, and that he did not have sufficient packing materials.

114.    According to the Binding Moving Estimate, Dwayne was supposed to have a team of four (including himself), quilted blankets, boxes, tape, and other moving materials.

115.    After this, Dwayne and his helper drove back into Santa Fe to hire packers and to buy packing materials.

116.    The materials which Dwayne found in Santa Fe were insufficient for the move.

117.    Dwayne found two or three additional helpers in Santa Fe.

118.    Dwayne's original helper returned, and the ones found in Santa Fe came to the Santa Fe property and began packing.

119.    As they did not have sufficient packing materials, Mr. Fahrenbach supplied them with his own.

120.    Dwayne then drove to Albuquerque, over an hour away, to obtain additional packing materials.

121.    Dwayne had some cash, which he used to buy the packing materials and pay his helpers.

122.    Upon information and belief, none of the individuals assisting Dwayne and the man who came with Dwayne were regular movers or packers.

123.    By the time Dwayne returned with additional materials, it was late at night on Monday, May 16.

124.    Very little was packed on Monday, May 16 – the day contractually reserved for packing.

125.    On Tuesday, May 17, 2022, Dwayne, the man who had arrived with him, and one fewer of the workers from the previous day (collectively, "Packers") returned and resumed the packing process.

126.    As one of the workers had not arrived, Dwayne frantically tried to find additional packers.

127.    After a short period, Dwayne hired the wife of one of the existing Packers.

128.    The wife had no idea what she was doing and largely sat around, providing moral support.

129.    Tuesday, May 17 had originally been reserved for loading.

130.    When the Packers packed Mr. Fahrenbach´s property, they did not fill many of the boxes properly.

131.    In many cases, the Packers placed few small items of actual property into boxes so that the boxes remained largely empty.

132.    The Packers filled the remaining space with miscellaneous packing material, typically crushed paper, or were just left partially empty.

133.    The extra filling was not done in a way that would reasonably protect fragile items.

134.    The Packers emptied a large plastic container filled with items to be moved. They placed the large plastic and now empty container into one cardboard box and placed the contents into another.

135.    On unpacking later, Mr. Fahrenbach discovered that one rolled yoga mat was put in a single large box with all the rest of the space empty.

136.    The Packers mocked Mr. Fahrenbach's home and his belongings, particularly his artwork, directly to Mr. Fahrenbach.

137.    Mr. Fahrenbach found this embarrassing.

138.    Mr. Fahrenbach tried to provide additional direction that had been provided to Perennial, such as which furniture needed additional care or cardboard padding for protection, to the Packers.

139.    The Packers acknowledged Mr. Fahrenbach's directions and reassured him they would follow those directions.

140.    Upon unpacking, Mr. Fahrenbach learned that they did not follow directions and were careless with his furniture and belongings, causing damage.

141.    The Packers finished packing Mr. Fahrenbach's property around nine p.m. on Tuesday, May 17.

142.    As of the end of May 17, Dwayne had not presented Mr. Fahrenbach with any paperwork, including a new estimate.


Real Property Damage

143.    On Tuesday night, after having left Mr. Fahrenbach's property for the day, Dwayne and the other man returned unannounced to Mr. Fahrenbach´s property in the tractor portion of the eighteen-wheeler.

144.    Mr. Fahrenbach's property is in a rural, spacious area. The Homeowner's Association ("HOA") maintains the roads, open space, and vegetation.

145.    Mr. Fahrenbach had already noticed that Dwayne appeared to have real trouble driving.

146.    Mr. Fahrenbach had noticed that Dwayne preferred to slide around corners on the dirt roads in his HOA area.

147.    In attempting to turn from the road into Mr. Fahrenbach's driveway by sliding around the corner, Dwayne drove his tractor into the HOA ditch by the side of the road.

148.   Dwayne was then unable to get out of the ditch and back onto the road.

149.   Dwayne dug in the wheels of the tractor in his futile attempts to drive the tractor out of the ditch by himself.

150.   Dwayne did significant damage to the ditch in going into it and then attempting to get out.

151.   The other man broke off large branches from several trees belonging to the HOA, supposedly to try and help Dwayne get out of the ditch.

152.   Dwayne engaged in the unsafe and unprofessional management of a motor vehicle.

153.   The next morning, a tow truck hired by Dwayne pulled the tractor out of the ditch.

154.   Mr. Fahrenbach is likely to be held responsible for the value of the damage if the HOA decides to pursue those claims.

<u>Loading Mr. Fahrenbach's Belongings</u>

155.   According to the Binding Moving Estimate, the truck was supposed to be fully loaded on Tuesday, May 17 and the move would have begun on May 18.

156.   The company moving Mr. Fahrenbach's wines arrived on May 18.

157.   The wine-moving company had no issues getting their truck into Mr. Fahrenbach's driveway.

158.   The wine-moving company was supposed to have clear and unfettered access to the Santa Fe Property in order to move the wines safely, quickly, and easily.

159.   On Wednesday, May 18, Dwayne and two of the uncertified individuals he had hired arrived to begin loading the eighteen-wheeler.

160.   The inefficient packing resulted in much more space occupied on the truck by boxes than necessary.

161.   The inefficient packing methods used by the Packers also resulted in fewer moving goods being able to be loaded into the truck than professional movers would be expected to.

162.   The Packers loaded the truck particularly inefficiently at the outset, leading to significant free space in the 'front' of the trailer, but an increasing squeeze in the 'back' of the trailer.

163.   Dwayne filled out sheets with numbers of items as they were loaded onto the truck.

164.   Dwayne did not mention or discuss these sheets with Mr. Fahrenbach as the loading occurred.

165.   The Packers and the wine company were all attempting to move simultaneously and getting in each other's way.

166.    The Packers were unable to finish the loading on Wednesday, May 18.

167.    The Packers returned on Thursday, May 19 to finish the loading process.

168.    Again, the Packers were supposed to be finished on Tuesday, so movers for Mr. Fahrenbach's art collection were at the Santa Fe Property on Thursday.

169.    The Packers and the art movers were in each other's way all day Thursday.

170.    The art movers were also able to get their truck onto the Santa Fe Property without issue.

171.    As the space in the moving truck filled, it became obvious that the Packers would be unable to fit all of Mr. Fahrenbach's property onto the truck.

172.    The Packers became increasingly careless with their moving.

173.    The Packers placed two teak benches into the trailer in a way that later broke them based on the position and pressure placed on them.

174.    Mr. Fahrenbach had specifically asked the Packers not to place the benches in that way.

175.    Mr. Fahrenbach had paid extra for two ATVs to be included in the trailer.

176.    The Packers did not drain gasoline from the ATVs prior to attempting to load them.

177.    The Packers attempted to hang the first ATV vertically in the trailer with the front of the ATV up the wall to fit it in.

178.    This positioning resulted in gasoline spilling over the ATV, the floor of the truck, and other items in the truck, so the Packers decided to place the ATV horizontally, which used up all remaining available space in the trailer.

179.    After placing the first ATV in this way, the Packers informed Mr. Fahrenbach they could not pack his second ATV.

180.    The Packers left the second ATV at Mr. Fahrenbach's Santa Fe Property for him to deal with on his own.

Green Planet's Revelation and New "Contract"

181.    The Packers finished loading the trailer, minus the second ATV, late Thursday, May 19.

182.    Dwayne paid the Packers who had not arrived with him in cash.

183.    Mr. Fahrenbach did not see any signatures or paperwork for any of the Packers.

184.    After closing the loaded trailer, Dwayne approached Mr. Fahrenbach and presented him with a stack of papers.

185.   At the top of the papers, Dwayne had placed a Household Goods Descriptive Inventory. Mr. Fahrenbach was expecting this and recognized it as a handwritten record of items that Dwayne had packed and loaded as they went, even though Dwayne had not said as much.

186.   Mixed into the Household Goods Descriptive Inventory in a way that appeared to intentionally minimize the chance of Mr. Fahrenbach noticing them, were a Revised Written Estimate ("Revised Estimate"), an Interstate Bill of Lading and Order for Service ("Bill of Lading"), a Household Goods Extraordinary Value Inventory ("EV Inventory"), and a Long-Distance Move document (collectively, "Paperwork").

187.   Mr. Fahrenbach asked what the Paperwork was.

188.   Dwayne evaded to answer the question, but demanded that Mr. Fahrenbach initial every single page.

189.   The Paperwork stated that now the move total was $41,050.80 ("Post-Loading Total"). The Binding Moving Estimate had stated the cost would be $32,873.00.

190.   Mr. Fahrenbach's initial payment of $9,642.61 to Perennial based on the Binding Moving Estimate was deducted as a prepaid deposit on the Bill of Lading.

191.   This new estimate abandoned the weight-based pricing as used in the Estimate and changed the pricing to be calculated by cubic feet.

192.   The Bill of Lading listed 4,200 cubic feet of space – almost 1,300 more that the Binding Moving Estimate, even without the second ATV – which were now priced at $7.00 per cubic foot.

193.   This use of rate per cubic foot alone increased the basic fee for the move from $20,319 to $29,400.

194.   The Bill of Lading stated that the cubic feet being moved was 4,200 ft, despite the Binding Moving Estimate listing the estimated cubic feet of the move to be only 2,903 ft.

195.   The increased cubic foot also increased the previously agreed upon fuel surcharge.

196.   The Bill of Lading had several charges that did not align with the Binding Moving Estimate.

197.   The Bill of Lading listed a shuttle fee for both origin and destination of $4,200.

198.   Mr. Fahrenbach had provided Perennial with information about the accessability of his property prior to the Binding Moving Estimate.

199.   The information made it obvious that a shuttle would be necessary.

200.   Despite this, the Binding Moving Estimate had not specifically included a shuttle fee. Exh. 1.

201. The Binding Moving Estimate had stated that a shuttle truck may be required at a minimum of $300.00. Exh. 1 at "Understanding Your Estimate."

202. The shuttle fee was well in excess of this $300.00.

203. The Bill of Lading listed the packing and labor fees were $4,830. The Binding Moving Estimate listed the full packing fees as $3,286.70.

204. The Bill of Lading listed the fuel surcharge would be $3,528.00. The Binding Moving Estimate listed the fuel surcharge as $2,438.28.

205. When questioned, Dwayne only said that the reason for the increase was the property was more than he expected.

206. When Mr. Fahrenbach pointed out again that he had provided a complete inventory, including photos and videos, of his moving goods to Perennial, Dwayne responded that he had not seen any of documentation, and that he was not with Perennial.

207. This was the first time that Mr. Fahrenbach learned that Dwayne was not with Perennial.

208. This was the first time that Mr. Fahrenbach learned of Green Planet.

209. After some back and forth, Mr. Fahrenbach asked Dwayne what would happen if he did not sign the Paperwork.

210. Dwayne told Mr. Fahrenbach that Green Planet now possessed all his personal property.

211. Dwayne told Mr. Fahrenbach that if Mr. Fahrenbach did not sign and agree to the increased amount, Green Planet would simply keep Mr. Fahrenbach's property.

212. Dwayne's statement intimidated and scared Mr. Fahrenbach.

213. Mr. Fahrenbach did not see any other option than to sign and initial the Paperwork provided as demanded and directed by Dwayne.

214. Mr. Fahrenbach signed the Paperwork under duress on May 19, 2022.

215. Mr. Fahrenbach signed all of this Paperwork after Dwayne had already packed, loaded, and locked the trailer.

216. The unloaded ATV remained a part of this Revised Written Estimate despite the fact it was not packed.

217. Mr. Fahrenbach did not see, and Dwayne did not indicate, that at least one of the pages had fine print on the back of the page.

218. Mr. Fahrenbach did not notice, and therefore did not read, review, initial, or sign the back page.

219.   One of the pages referred to more documents that were ostensibly integrated into this Paperwork, but were only accessible at Green Planet's offices.

220.   Mr. Fahrenbach did not see the fine print referring to these other pages.

221.   Mr. Fahrenbach would not have had an opportunity to examine these other pages, given the statements of Dwayne that he had to sign immediately.

222.   After receiving Mr. Fahrenbach's signature, Dwayne demanded immediate payment of $18,873.71.

223.   Mr. Fahrenbach paid $18,873.71.

224.   As of May 19, 2022, Mr. Fahrenbach would still owe $4,356.68 under the Binding Moving Estimate. Exh. 1.

225.   As of May 19, 2022, Mr. Fahrenbach would owe $12,534.48 under the Post-Loading Total.

226.   After receiving Mr. Fahrenbach's check, Dwayne left, upon information and belief to begin the cross-country move.

<u>The Cross-Country Move and Unloading</u>

227.   On May 25, 2022, an employee of Green Planet by the name of Kristen sent Mr. Fahrenbach a third bill via e-mail, this time demanding $51,839.82 ("Driving Total") and immediate payment of the "remaining balance" of $23,323.50.

228.   Mr. Fahrenbach reached out to Angela, whom he had spoken to before, at Perennial for assistance.

229.   For the first time since May 9, Perennial responded.

230.   Angela arranged for a phone call between Mr. Fahrenbach, Green Planet, and herself.

231.   On that call, Green Planet acknowledged some of its overbilling.

232.   On that call, Angela stated that Perennial worked with Green Planet often.

233.   On that call, Perennial, through Angela, did not enforce the estimate of the Binding Moving Estimate.

234.   On that call, Perennial worked with Green Planet to intimidate Mr. Fahrenbach and attempt to bully him into paying the higher price.

235.   Based on the call, Green Planet reduced their final invoice from $51,839.82 to $49,297.02 ("Post-Call Total").

236.   Based on the Post-Call Total, Green Planet sent Mr. Fahrenbach a new invoice stating his remaining balance owed was $20,780.70.

237.    This was $8,200 more than the Post-Loading total.

238.    Mr. Fahrenbach had not agreed to this as a reasonable resolution on the phone call or otherwise.

239.    When Dwayne arrived in Massachusetts, Mr. Fahrenbach asked Dwayne to unload the truck.

240.    Mr. Fahrenbach feared that Green Planet would further damage his property.

241.    Mr. Fahrenbach asked Dwayne not to unwrap the blankets from most of the the furniture, as he wanted him to leave quickly.

242.    Mr. Fahrenbach agreed with Dwayne to pay Green Planet the retail price of $15.00 for each blanket he left behind, and gave him $1,000 in cash as a down-payment.

243.    Dwayne kept a tab of the blankets he left behind (54 in total), and took the rest of the blankets.

244.    Mr. Fahrenbach paid Green Planet for 54 of the blankets in the final payment.

245.    Once most of Mr. Fahrenbach's belongings were safely in his possession, Mr. Fahrenbach locked the garage where his personal property had been stored, and did not let Dwayne inside again.

246.    Dwayne demanded the $20,780.70 for which Green Planet had invoiced Mr. Fahrenbach after the call, in cash.

247.    Mr. Fahrenbach refused to make the additional payment to him, and told Dwayne he would discuss and settle the matter with Dwayne´s manager.

248.    After Mr. Fahrenbach refused to make a payment to him, Dwayne expressed fear to Mr. Fahrenbach that he would be personally responsible for covering anything Mr. Fahrenbach did not pay.

249.    Mr. Fahrenbach told Dwayne again that he would speak to his manager.

250.    Dwayne became angry at Mr. Fahrenbach.

251.    Several lounge chairs ("Eames Chairs") were still on the truck at this point.

252.    Mr. Fahrenbach saw the Eames Chairs looking fine, although still wrapped, on the truck.

253.    After refusing to make the payment, Dwayne unloaded these chairs.

254.    Later that evening, Mr. Fahrenbach saw one of the Eames Chairs was now misshapen.

255.    Mr. Fahrenbach unwrapped the chair and saw it was broken in half, as if by deliberate force.

256.    Upon information and belief, Dwayne purposefully broke the chair.

257.    Through Dwayne and over the phone, Green Planet threatened that if Mr. Fahrenbach did not comply with their payment demands, Mr. Fahrenbach would be criminally charged and Green Planet would also sue him civilly.

258.    In further effort to convince Mr. Fahrenbach to pay the increased invoice, the Green Planet representative told Mr. Fahrenbach that it would file suit in Colorado against him and require him to travel across the country himself.

259.    Dwayne left after this point.

260.    Either Dwayne or Green Planet contacted the Barnstable, Massachusetts police.

261.    Green Planet reported to the Barnstable police that Mr. Fahrenbach had stolen Green Planet's blankets.

262.    The Barnstable police officer then arrived on Mr. Fahrenbach´s property in Massachusetts.

263.    Mr. Fahrenbach explained to the Barnstable police that he and Dwayne had agreed that the moving blankets which were still wrapped around unpacked moving goods shall be left behind, and that Mr. Fahrenbach had paid for them.

264.    The officer then called Dwayne on his phone, asking whether Mr. Fahrenbach´s description that there was an agreement that he would buy the blankets was correct – which Dwayne confirmed.

265.    The officer warned Dwayne not to make false accusations of larceny.

266.    The officer ultimately left Mr. Fahrenbach's property without charging or arresting Mr. Fahrenbach as Green Planet had requested.

267.    The following day, Mr. Fahrenbach did pay Green Planet $12,644.48, based on the Post-Loading Total, but not the remainder of the Post-Call Total.

268.    Mr. Fahrenbach did not believe or agree that he owed this money to Green Planet, but paid it out of a good faith attempt to resolve the issue.

269.    Perennial did move Mr. Fahrenbach's Toyota.

270.    Perennial charged Mr. Fahrenbach $2,100 for moving the Toyota instead of the $1,900 in the estimate without explanation.

<u>Post-Unloading</u>

271.    Mr. Fahrenbach reviewed his furniture after Dwayne had left.

272. Upon removing the blanket, Mr. Fahrenbach found that the lounge chair that had been broken in half. The chair was beyond repair.

273. Other furniture had been broken or damaged over the course of the move due to the methods of packing and loading used by Green Planet.

274. Several pieces of furniture are beyond repair.

275. Mr. Fahrenbach noticed that a small teak outdoor side table was missing a leg upon unloading.

276. After Dwayne left Mr. Fahrenbach, he teased Mr. Fahrenbach over the phone that he had found the missing leg but would not return it unless Mr. Fahrenbach paid Green Planet in cash.

277. Upon unpacking, Mr. Fahrenbach found boxes that had, for example, just two or three books in them and eighty percent packing paper, or that a handful of computer cables that would fill half of a regular shoe box were put in a large box, leaving 90 percent of the box to be filled with packing material.

278. Mr. Fahrenbach has not yet finished unpacking and finds new damage and inefficient packing every time he does so.

279. At the moment, the cost of repairs to Mr. Fahrenbach is between $15,000 to $19,580.

280. The decrease in value to Mr. Fahrenbach's property is currently unknown, but will be proven at trial.

281. Additional repairs and replacements are likely and will be added to these claims as they are discovered.

<u>Colorado Small Claims Court and Notice</u>

282. While trying to force Mr. Fahrenbach to pay the increased total for the move, Green Planet threatened that if Mr. Fahrenbach did not comply, he would be criminally charged and Green Movers would sue him civilly.

283. Green Planet filed a Complaint against Mr. Fahrenbach in Arapahoe County Small Claims Court, Colorado on June 8, 2022.

284. Green Planet used the documents which Mr. Fahrenbach signed under duress as justification for the suit.

285. The Small Claims Court dismissed Green Planets claims against Mr. Fahrenbach for failure to prosecute on November 4, 2022.

286. On December 7, 2022, Mr. Fahrenbach filed a motion for reasonable costs and attorney's fees.

287.  On January 6, 2023, Green Planet filed a response to the motion for reasonable costs and attorney's fees requesting, "At this point Green Planet has decided this is not worth the time and money it is taking to prosecute. If the defendant continues to seek fees, then Green Planet would like to re-open the case and prosecute as originally intended." See attached Exhibit 2.

288.  On April 19, 2023, Green Planet filed a motion to set aside the dismissal of the small claims court case.

289.  On April 26, 2023, the small claims court denied the motion to set aside the dismissal.

290.  On April 28, 2023, in oral findings at a hearing on attorney's fees, the small claims court found Green Planet's suit vexatious and frivolous and awarded reasonable costs and attorney's fees of $7,780.00 to Mr. Fahrenbach.

291.  On June 6, 2023, the small claims court awarded supplemental costs and attorney's fees of $3,588.50 to Mr. Fahrenbach.

292.  Mr. Fahrenbach sent Perennial a notice of claims and request for documents on September 23, 2022.

293.  Mr. Fahrenbach sent Green Planet a notice of claims and request for documents on September 29, 2022. This included a demand under section 9 of the Massachusetts Consumer Protection Act.

294.  Neither Perennial nor Green Planet has sent Mr. Fahrenbach any requested documents.

**FIRST CLAIM FOR RELIEF**
**AGAINST DEFENDANTS PERENNIAL AND GREEN PLANET**
**FEDERAL CLAIM UNDER 49 U.S. Code Part B – MOTOR CARRIERS, WATER CARRIERS, BROKERS, AND FREIGHT FORWARDERS**

295.  This section incorporates by reference each of the prior allegations and paragraphs.

296.  All references to statutory sections of 49 U.S. Code Part B below include all Code of Federal Regulations sections and law referring to or interpreting those statutory sections.

297.  Green Planet is a motor carrier of household goods under 49 U.S.C. §13102.

298.  Perennial is an interstate brokerage service, or broker, under 49 U.S.C. §13102.

299.  Green Planet is a motor carrier providing transportation of household goods.

300.  Green Planet did not use due diligence and reasonable care in selecting its agents as required under 49 U.S.C. §§13907 and generally under 49 U.S. Code Part B ("Title 49B").

301.    Green Planet authorized one of its employees to hire agents in a big box store parking lot.

302.    The agents selected by Green Planet were not knowledgeable, fit, willing, or able to provide the contracted services to Mr. Fahrenbach or the obligations under 4Title 49B.

303.    This failure to use due diligence and reasonable care resulted in unqualified individuals packing, loading, and moving Mr. Fahrenbach's belongings.

304.    This failure to use due diligence and reasonable care as required under 49 U.S.C. §13907 and generally under Title 49B. resulted in inefficient loading of Mr. Fahrenbach's belongings.

305.    This failure to use due diligence and reasonable care as required under 49 U.S.C. §13907 and generally under Title 49B. resulted in Green Planet being unable to move Mr. Fahrenbach's second ATV.

306.    This failure to use due diligence and reasonable care as required under 49 U.S.C. §13907 and generally under Title 49B. resulted in Green Planet spilling gasoline on Mr. Fahrenbach's belongings.

307.    Green Planet served as a moving broker by hiring unknown individuals to assist with packing and loading in Santa Fe.

308.    Upon information and belief, none of these individuals were employees of Green Planet.

309.    Upon information and belief, none of these individuals were federally certified movers.

310.    In hiring these agents Green Planet acted as a broker as defined under 49 U.S.C. §13102 and generally under Title 49B.

311.    In acting as a broker, Green Planet failed to register as required under 49 U.S.C. §13904 and generally under Title 49B.

312.    In allowing Green Planet to engage non-certified movers and individuals, Perennial failed in its obligations as a broker as required under 49 U.S.C. §13907 and generally under Title 49B.

313.    Interstate brokers are only registered with sufficient experience and if fit, willing, and able to be a broker for transportation.

314.    Green Planet does not have sufficient experience as an interstate broker to be registered.

315.    The Packers which Green Planet hired were not fit, willing, or able to perform the duties delegated to them.

316. Green Planet knowingly authorized, consented to, and permitted acting as a broker without being registered as an interstate broker.

317. Green Planet's partners, officers, directors, and principals are jointly and severally liable with Green Planet for this violation.

318. This acting as a broker without registration resulted in unqualified individuals packing, loading, and moving Mr. Fahrenbach's belongings.

319. This acting as a broker without registration resulted in Mr. Fahrenbach's belongings being damaged.

320. This acting as a broker without registration resulted in inefficient loading of Mr. Fahrenbach's belongings.

321. This acting as a broker without registration resulted in Green Planet being unable to move Mr. Fahrenbach's second ATV.

322. This acting as a broker without registration resulted in Green Planet spilling gasoline on Mr. Fahrenbach's belongings.

323. Mr. Fahrenbach has been damaged by Green Planet's and Perennial's violations of 49 U.S.C. §13907 and generally under Title 49Bin an amount to be proven at trial.

324. Green Planet failed to abide by its obligations under 49 U.S.C. § 13907.

325. Green Planet and Perennial failed to honor the Binding Moving Estimate provided to Mr. Fahrenbach pursuant to 49 U.S.C. §§ 13701 et seq. and §§14101 et seq.

326. Green Planet failed to provide Mr. Fahrenbach a Bill of Lading prior to loading his belongings on their truck pursuant to 49 U.S.C. §§ 13701 et seq. and §§14101 et seq..

327. Green Planet failed to provide Mr. Fahrenbach an adjusted estimate prior to loading his belongings on their truck pursuant to 49 U.S.C. §§ 13701 et seq. and §§14101 et seq..

328. Green Planet failed to provide Mr. Fahrenbach their terms and conditions.

329. Green Planet coerced Mr. Fahrenbach to sign an adjusted estimate and other documents after his possessions were on the truck, under threat of lien of the property and retention.

330.    Perennial refused to uphold the obligation that an estimate signed after the loading of the possessions not be honored pursuant to 49 U.S.C. §§ 13701 et seq. and §§14101 et seq.

331.    Perennial supported Green Planet in obtaining funds from an ill-gotten estimate.

332.    Perennial informed Mr. Fahrenbach that he had to pay the funds from an ill-gotten estimate.

333.    Perennial deliberately concealed that they were a broker until providing Mr. Fahrenbach the Binding Moving Estimate.

334.    Perennial's website is deceptive and misleading that they are a broker and not a moving company.

335.    Perennial and Green Planet have illicitly overcharged Mr. Fahrenbach for his move pursuant to 49 U.S.C. §§ 13701 et seq. and §§14101 et seq.

336.    Mr. Fahrenbach has been injured by the violations of federal law, particularly Title 49B, by Green Planet and Perennial in having to pay more than the Binding Moving Estimate, the damages to his property, and the additional time and effort which he expended, in amounts to be proven at trial.

337.    Mr. Fahrenbach has suffered damages based on Green Planet and Perennial's violations of federal law in amounts to be proven at trial.

338.    Mr. Fahrenbach is entitled to reasonable costs and attorney's fees.

### SECOND CLAIM FOR RELIEF
### AGAINST DEFENDANT PERENNIAL
### BREACH OF CONTRACT

339.    This section incorporates by reference each of the prior allegations and paragraphs.

340.    The choice of law clause in the Binding Moving Estimate is invalid because it is for a contract for less than $250,000.00.

341.    Under Florida law, the law governing the contract is the one in which the final act of the contract takes place.

342.    The law governing the contract is the law of the state of Massachusetts.

343.    The Binding Moving Estimate is a contract between Perennial and Mr. Fahrenbach.

344.    Perennial breached the Binding Moving Estimate in numerous ways as identified in the previous paragraphs.

345.    Perennial put forth representations that it would be performing the move for Mr. Fahrenbach.

346.    Green Planet actually performed several of Perennial's obligations, without representing that it was separate from Perennial.

347.    Perennial had apparent authority over Green Planet and its employees over the course of the move.

348.    Green Planet's breach of Perennial's obligations under the Binding Moving Estimate are imputed to Perennial.

349.    Green Planet breached the Binding Moving Estimate in numerous ways as identified in the previous paragraphs.

350.    Perennial breached the Binding Moving Estimate in other ways which may be proved at trial.

351.    Perennial's breach of the Binding Moving Estimate caused Mr. Fahrenbach non-property damages in the unnecessary expenditure of Mr. Fahrenbach's time and effort in assisting with the process and in handling the extra ATV on his own.

352.    Perennial's breach of the Binding Moving Estimate caused Mr. Fahrenbach non-property damages in taking two extra days of his time in supervising the packing and loading.

353.    Perennial's breach of the Binding Moving Estimate caused Mr. Fahrenbach non-property damages in the payment of out-of-pocket costs for his move which were purportedly included in the move.

354.    Perennial's breach of the Binding Moving Estimate caused Mr. Fahrenbach property damages in the actual damage to the HOA road and trees.

355.    Perennial's breach of the Binding Moving Estimate has caused Mr. Fahrenbach stress and emotional damages in amounts to be proven at trial.

356.    Perennial caused Mr. Fahrenbach additional damages in amounts to be proven at trial.

357.    Mr. Fahrenbach is entitled to reasonable costs and attorney's fees based on Perennials' breaches of contract.

358.    Green Planet is a third-party beneficiary of the Binding Moving Estimate.

359.    The regular references to Green Planet (as carrier) indicate all parties' intentions for Green Planet to be bound by the Binding Moving Estimate.

360.    Mr. Fahrenbach was never provided the entirety of Green Planet's terms and conditions.

361.    Mr. Fahrenbach was not provided any documents from Green Planet until after Green Planet had loaded the moving truck.

362.    Neither Perennial nor Green Planet has provided Mr. Fahrenbach the agreement between Perennial and Green Planet.

363.    Green Planet breached the Binding Moving Estimate as identified in the previous paragraphs.

364.    Green Planet breached the Binding Moving Estimate in other ways which may be proved at trial.

365.    Green Planet's breach of the Binding Moving Estimate caused Mr. Fahrenbach non-property damages in the unnecessary expenditure of Mr. Fahrenbach's time and effort in assisting with the process and in handling the extra ATV on his own, as well as handling the gasoline clean-up.

366.    Green Planet's breach of the Binding Moving Estimate caused Mr. Fahrenbach non-property damages in taking two extra days of his time in supervising the packing and loading.

367.    Green Planet's breach of the Binding Moving Estimate caused Mr. Fahrenbach non-property damages in the payment of out-of-pocket costs for his move which were purportedly included in the move.

368.    Green Planet's breach of the Binding Moving Estimate caused Mr. Fahrenbach property damages in the actual damage to the HOA road and trees.

369.    Green Planet's breach of the Binding Moving Estimate has caused Mr. Fahrenbach stress and emotional damages in amounts to be proven at trial.

370.    Green Planet caused Mr. Fahrenbach additional damages in amounts to be proven at trial.

371.    Mr. Fahrenbach is entitled to reasonable costs and attorney's fees based on Perennials' breaches of contract.

**THIRD CLAIM FOR RELIEF**
**AGAINST DEFENDANTS PERENNIAL AND GREEN PLANET**
**MASSACHUSETTS CONSUMER PROTECTION ACT (ALM G.L. Ch. 93A, § 9)**

372.    Paragraphs 372 through 432 omitted due to ECF 42.

373.    Paragraphs 372 through 432 omitted due to ECF 42.

374.    Paragraphs 372 through 432 omitted due to ECF 42.

375.    Paragraphs 372 through 432 omitted due to ECF 42.

376.    Paragraphs 372 through 432 omitted due to ECF 42.

377.    Paragraphs 372 through 432 omitted due to ECF 42.

378.    Paragraphs 372 through 432 omitted due to ECF 42.

379.    Paragraphs 372 through 432 omitted due to ECF 42.

380.    Paragraphs 372 through 432 omitted due to ECF 42.

381.    Paragraphs 372 through 432 omitted due to ECF 42.

382.    Paragraphs 372 through 432 omitted due to ECF 42.

383.    Paragraphs 372 through 432 omitted due to ECF 42.

384.    Paragraphs 372 through 432 omitted due to ECF 42.

385.    Paragraphs 372 through 432 omitted due to ECF 42.

386.    Paragraphs 372 through 432 omitted due to ECF 42.

387.    Paragraphs 372 through 432 omitted due to ECF 42.

388.    Paragraphs 372 through 432 omitted due to ECF 42.

389.    Paragraphs 372 through 432 omitted due to ECF 42.

390.    Paragraphs 372 through 432 omitted due to ECF 42.

391.    Paragraphs 372 through 432 omitted due to ECF 42.

392.    Paragraphs 372 through 432 omitted due to ECF 42.

393.    Paragraphs 372 through 432 omitted due to ECF 42.

394.    Paragraphs 372 through 432 omitted due to ECF 42.

395.    Paragraphs 372 through 432 omitted due to ECF 42.

396.    Paragraphs 372 through 432 omitted due to ECF 42.

397.    Paragraphs 372 through 432 omitted due to ECF 42.

398.    Paragraphs 372 through 432 omitted due to ECF 42.

399.    Paragraphs 372 through 432 omitted due to ECF 42.

400.    Paragraphs 372 through 432 omitted due to ECF 42.

401.    Paragraphs 372 through 432 omitted due to ECF 42.

402.    Paragraphs 372 through 432 omitted due to ECF 42.

403.    Paragraphs 372 through 432 omitted due to ECF 42.

404.    Paragraphs 372 through 432 omitted due to ECF 42.

405.    Paragraphs 372 through 432 omitted due to ECF 42.

406.    Paragraphs 372 through 432 omitted due to ECF 42.

407.    Paragraphs 372 through 432 omitted due to ECF 42.

408.    Paragraphs 372 through 432 omitted due to ECF 42.

409.    Paragraphs 372 through 432 omitted due to ECF 42.

410.    Paragraphs 372 through 432 omitted due to ECF 42.

411.    Paragraphs 372 through 432 omitted due to ECF 42.

412.    Paragraphs 372 through 432 omitted due to ECF 42.

413.    Paragraphs 372 through 432 omitted due to ECF 42.

414.    Paragraphs 372 through 432 omitted due to ECF 42.

415.    Paragraphs 372 through 432 omitted due to ECF 42.

416.    Paragraphs 372 through 432 omitted due to ECF 42.

417.    Paragraphs 372 through 432 omitted due to ECF 42.

418.    Paragraphs 372 through 432 omitted due to ECF 42.

419.    Paragraphs 372 through 432 omitted due to ECF 42.

420.    Paragraphs 372 through 432 omitted due to ECF 42.

421.    Paragraphs 372 through 432 omitted due to ECF 42.

422.    Paragraphs 372 through 432 omitted due to ECF 42.

423.    Paragraphs 372 through 432 omitted due to ECF 42.

424.    Paragraphs 372 through 432 omitted due to ECF 42.

425.    Paragraphs 372 through 432 omitted due to ECF 42.

426.    Paragraphs 372 through 432 omitted due to ECF 42.

427.    Paragraphs 372 through 432 omitted due to ECF 42.

428.    Paragraphs 372 through 432 omitted due to ECF 42.

429.    Paragraphs 372 through 432 omitted due to ECF 42.

430.    Paragraphs 372 through 432 omitted due to ECF 42.

431.    Paragraphs 372 through 432 omitted due to ECF 42.

432.    Paragraphs 372 through 432 omitted due to ECF 42.

**FOURTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT PERENNIAL**
**FLORIDA FALSE ADVERTISING STATUTE (Fla. Stat. § 817.41)**

433.    Paragraphs 433 through 456 omitted due to ECF 42.

434.    Paragraphs 433 through 456 omitted due to ECF 42.

435.    Paragraphs 433 through 456 omitted due to ECF 42.

436.    Paragraphs 433 through 456 omitted due to ECF 42.

437.    Paragraphs 433 through 456 omitted due to ECF 42.

438.    Paragraphs 433 through 456 omitted due to ECF 42.

439.    Paragraphs 433 through 456 omitted due to ECF 42.

440.    Paragraphs 433 through 456 omitted due to ECF 42.

441.    Paragraphs 433 through 456 omitted due to ECF 42.

442.    Paragraphs 433 through 456 omitted due to ECF 42.

443.    Paragraphs 433 through 456 omitted due to ECF 42.

444.    Paragraphs 433 through 456 omitted due to ECF 42.

445.    Paragraphs 433 through 456 omitted due to ECF 42.

446.    Paragraphs 433 through 456 omitted due to ECF 42.

447.    Paragraphs 433 through 456 omitted due to ECF 42.

448.    Paragraphs 433 through 456 omitted due to ECF 42.

449.    Paragraphs 433 through 456 omitted due to ECF 42.

450.    Paragraphs 433 through 456 omitted due to ECF 42.

451.    Paragraphs 433 through 456 omitted due to ECF 42.

452.    Paragraphs 433 through 456 omitted due to ECF 42.

453.    Paragraphs 433 through 456 omitted due to ECF 42.

454.    Paragraphs 433 through 456 omitted due to ECF 42.

455.    Paragraphs 433 through 456 omitted due to ECF 42.

456.    Paragraphs 433 through 456 omitted due to ECF 42.

**FIFTH CLAIM FOR RELIEF**
**AGAINST DEFENDANTS PERENNIAL AND GREEN PLANET**
**FRAUDULENT INDUCEMENT/MISREPRESENTATION**

457.    Paragraphs 457 through 487 omitted due to ECF 42.

458.    Paragraphs 457 through 487 omitted due to ECF 42.

459.    Paragraphs 457 through 487 omitted due to ECF 42.

460.    Paragraphs 457 through 487 omitted due to ECF 42.

461.    Paragraphs 457 through 487 omitted due to ECF 42.

462.    Paragraphs 457 through 487 omitted due to ECF 42.

463.    Paragraphs 457 through 487 omitted due to ECF 42.

464.    Paragraphs 457 through 487 omitted due to ECF 42.

465.    Paragraphs 457 through 487 omitted due to ECF 42.

466.    Paragraphs 457 through 487 omitted due to ECF 42.

467.    Paragraphs 457 through 487 omitted due to ECF 42.

468.    Paragraphs 457 through 487 omitted due to ECF 42.

469.    Paragraphs 457 through 487 omitted due to ECF 42.

470.    Paragraphs 457 through 487 omitted due to ECF 42.

471.    Paragraphs 457 through 487 omitted due to ECF 42.

472.    Paragraphs 457 through 487 omitted due to ECF 42.

473.    Paragraphs 457 through 487 omitted due to ECF 42.

474.    Paragraphs 457 through 487 omitted due to ECF 42.

475.    Paragraphs 457 through 487 omitted due to ECF 42.

476.    Paragraphs 457 through 487 omitted due to ECF 42.

477.    Paragraphs 457 through 487 omitted due to ECF 42.

478.    Paragraphs 457 through 487 omitted due to ECF 42.

479.    Paragraphs 457 through 487 omitted due to ECF 42.

480.    Paragraphs 457 through 487 omitted due to ECF 42.

481.    Paragraphs 457 through 487 omitted due to ECF 42.

482.   Paragraphs 457 through 487 omitted due to ECF 42.

483.   Paragraphs 457 through 487 omitted due to ECF 42.

484.   Paragraphs 457 through 487 omitted due to ECF 42.

485.   Paragraphs 457 through 487 omitted due to ECF 42.

486.   Paragraphs 457 through 487 omitted due to ECF 42.

487.   Paragraphs 457 through 487 omitted due to ECF 42.

## SIXTH CLAIM FOR RELIEF
## AGAINST DEFENDANTS PERENNIAL AND GREEN PLANET
## NEGLIGENT MISREPRESENTATION

488.   Paragraphs 488 through 515 omitted due to ECF 42.

489.   Paragraphs 488 through 515 omitted due to ECF 42.

490.   Paragraphs 488 through 515 omitted due to ECF 42.

491.   Paragraphs 488 through 515 omitted due to ECF 42.

492.   Paragraphs 488 through 515 omitted due to ECF 42.

493.   Paragraphs 488 through 515 omitted due to ECF 42.

494.   Paragraphs 488 through 515 omitted due to ECF 42.

495.   Paragraphs 488 through 515 omitted due to ECF 42.

496.   Paragraphs 488 through 515 omitted due to ECF 42.

497.   Paragraphs 488 through 515 omitted due to ECF 42.

498.   Paragraphs 488 through 515 omitted due to ECF 42.

499.   Paragraphs 488 through 515 omitted due to ECF 42.

500.   Paragraphs 488 through 515 omitted due to ECF 42.

501.   Paragraphs 488 through 515 omitted due to ECF 42.

502.   Paragraphs 488 through 515 omitted due to ECF 42.

503.    Paragraphs 488 through 515 omitted due to ECF 42.

504.    Paragraphs 488 through 515 omitted due to ECF 42.

505.    Paragraphs 488 through 515 omitted due to ECF 42.

506.    Paragraphs 488 through 515 omitted due to ECF 42.

507.    Paragraphs 488 through 515 omitted due to ECF 42.

508.    Paragraphs 488 through 515 omitted due to ECF 42.

509.    Paragraphs 488 through 515 omitted due to ECF 42.

510.    Paragraphs 488 through 515 omitted due to ECF 42.

511.    Paragraphs 488 through 515 omitted due to ECF 42.

512.    Paragraphs 488 through 515 omitted due to ECF 42.

513.    Paragraphs 488 through 515 omitted due to ECF 42.

514.    Paragraphs 488 through 515 omitted due to ECF 42.

515.    Paragraphs 488 through 515 omitted due to ECF 42.

### SEVENTH CLAIM FOR RELIEF
### AGAINST DEFENDANTS PERENNIAL AND GREEN PLANET'S
### CIVIL CONSPIRACY

516.    This section incorporates by reference each of the prior allegations and paragraphs.

517.    Perennial and Green Planet entered into a relationship in Florida.

518.    Perennial and Green Planet conducted the conspiracy in Colorado, Florida, New Mexico, and Massachusetts.

519.    As the original location of the conspiracy is Florida, the law of Florida should be applied to this claim.

520.    Perennial and Green Planet acted in concert to mislead Mr. Fahrenbach.

521.    Perennial and Green Planet intended for Mr. Fahrenbach to agree to a lower price and then pay a higher price for his move, to benefit both Perennial and Green Planet.

522. Perennial and Green Planet intentionally operate a system in which additional documentation of property is not delivered from broker to carrier when provided in order to delay the point at which the carrier informs the customer that the price needs to be increased until customer loses his opportunity to cancel a move without penalty or inconvenience.

523. Perennial admitted it had worked with Green Planet extensively before.

524. Perennial said it would support Mr. Fahrenbach in the price dispute with Green Planet, then instead worked with Green Planet to pressure Mr. Fahrenbach.

525. Perennial and Green Planet agreed to undertake their deceptive and unfair acts under the Consumer Protection Act, the breach of contract, the violations of federal law, the fraudulent misrepresentation, and extortion together.

526. Each of Perennial and Green Planet undertook affirmative acts towards their agreement, as identified in the paragraphs above.

527. Mr. Fahrenbach was actually injured by this conspiracy, as identified in the underlying claims at issue.

528. Mr. Fahrenbach suffered damages as a result of these injuries in an amount to be proven at trial.

529. Mr. Fahrenbach is entitled to other relief as the Court deems appropriate under this claim, including reasonable costs and attorney's fees.


## EIGHTH CLAIM FOR RELIEF
## AGAINST DEFENDANT GREEN PLANET
## CONVERSION

530. Paragraphs 530 through 541 omitted due to ECF 42.

531. Paragraphs 530 through 541 omitted due to ECF 42.

532. Paragraphs 530 through 541 omitted due to ECF 42.

533. Paragraphs 530 through 541 omitted due to ECF 42.

534. Paragraphs 530 through 541 omitted due to ECF 42.

535. Paragraphs 530 through 541 omitted due to ECF 42.

536.    Paragraphs 530 through 541 omitted due to ECF 42.

537.    Paragraphs 530 through 541 omitted due to ECF 42.

538.    Paragraphs 530 through 541 omitted due to ECF 42.

539.    Paragraphs 530 through 541 omitted due to ECF 42.

540.    Paragraphs 530 through 541 omitted due to ECF 42.

541.    Paragraphs 530 through 541 omitted due to ECF 42.

## NINTH CLAIM FOR RELIEF
## AGAINST DEFENDANT GREEN PLANET
## ABUSE OF PROCESS

542.    This section incorporates by reference each of the prior allegations and paragraphs.

543.    The actions giving rise to an abuse of process claim took place in New Mexico, Massachusetts, and Colorado.

544.    Each state's law governs the respective abuse of process that took place within it.

545.    Green Planet threatened Mr. Fahrenbach with a lien and the resale of his property, which is a part of "process", while at his residence in New Mexico.

546.    Green Planet used this threat of process for the illegitimate purpose of eliciting a signature from Mr. Fahrenbach on documents which he had not had a chance to read or review.

547.    Green Planet used this threat of process for the illegitimate purpose of eliciting agreement to documents after Green Planet already had possession of Mr. Fahrenbach's belongings.

548.    Green Planet used this threat of process for the illegitimate purpose of eliciting agreement to additional payment of money from Mr. Fahrenbach.

549.    This abuse resulted in damage to Mr. Fahrenbach.

550.    Mr. Fahrenbach signed the paperwork due to this threat.

551.    Mr. Fahrenbach agreed to the increased payment because of this threat.

552.    Mr. Fahrenbach actually paid additional monies because of this threat.

553.    From their offices in Colorado, Green Planet additionally threatened Mr. Fahrenbach with a lien and resale of his property while his property was in transit.

554.    Green Planet used this threat of process for the illegitimate purpose of eliciting yet a higher amount owed from Mr. Fahrenbach for tasks already performed.

555.    This abuse resulted in damage to Mr. Fahrenbach.

556.    Mr. Fahrenbach actually paid additional monies because of this threat.

557.    From their offices in Colorado and in person at his property in Massachusetts, Green Planet threatened Mr. Fahrenbach with criminal action based on false claims of larceny if Mr. Fahrenbach did not pay additional unowed monies to Green Planet.

558.    Green Planet called the Barnstable Massachusetts police and falsely reported larceny as a result of this threat.

559.    The Barnstable police came to Mr. Fahrenbach's home, causing him embarrassment.

560.    The Barnstable police came to Mr. Fahrenbach's home, resulting in him spending additional time to defend himself.

561.    The Barnstable police did not charge Mr. Fahrenbach for larceny or any other crime.

562.    The Barnstable police warned Green Planet against making false allegations.

563.    From their offices in Colorado and in person at his property in Massachusetts, Green Planet threatened Mr. Fahrenbach with litigation in Colorado if he did not pay additional unowed monies to Green Planet.

564.    Green Planet told Mr. Fahrenbach that they threatened Mr. Fahrenbach with litigation in small claims court specifically so that Mr. Fahrenbach would have to personally go to Colorado to defend himself.

565.    Green Planet was not owed additional monies by Mr. Fahrenbach.

566.    The threat of litigation was to induce Mr. Fahrenbach to pay over $20,000 more than his original estimate.

567.    Green Planet actually improperly brought litigation in small claims court in Colorado.

568.    Mr. Fahrenbach had to defend himself in small claims court.

569.    Mr. Fahrenbach had to hire Colorado counsel to defend him in small claims court.

570.    Mr. Fahrenbach spent significant costs and attorney's fees, as well as his own time, on the litigation.

571.    Green Planet ultimately decided not to pursue the litigation in the midst of the litigation.

572.    The Colorado Court would ultimately find that Green Planet had acted frivolously and vexatiously and awarded Mr. Fahrenbach partial costs and attorney's fees.

573.    Mr. Fahrenbach suffered damages as a result of these injuries in an amount to be proven at trial.

574.    Mr. Fahrenbach is entitled to other relief as the Court deems appropriate under this claim, including reasonable costs and attorney's fees minus those already awarded by the Colorado court.

**TENTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT GREEN PLANET**
**MALICIOUS PROSECUTION**

575.    This section incorporates by reference each of the prior allegations and paragraphs.

576.    Green Planet brought a small claims court against Mr. Fahrenbach in Colorado.

577.    This claim is governed by the laws of the state of Colorado.

578.    Green Planet brought a small claims court action against Mr. Fahrenbach for the difference between the Post-Loading Total and the Post-Call Total, reduced to fit the small claims court limitation for damages.

579.    Green Planet based the small claims court action on the paperwork which Green Planet had coerced Mr. Fahrenbach to sign under duress.

580.    Green Planet told Mr. Fahrenbach prior to filing the case that they would file in small claims court in Colorado specifically to make him come to Colorado from Massachusetts to defend himself.

581.    Mr. Fahrenbach defended himself remotely for the first part of the small claims court case.

582.    Mr. Fahrenbach hired a Colorado attorney.

583.    The small claims court ultimately dismissed the case against Mr. Fahrenbach for failure to prosecute.

584.    Green Planet had no basis for its small court claims.

585.    Green Planet, by its own admission, brought the claim specifically to punish Mr. Fahrenbach.

586.    Mr. Fahrenbach suffered damages due to the filing of the claim.

587.  Mr. Fahrenbach suffered damages as a result of these injuries in an amount to be proven at trial.

588.  Mr. Fahrenbach is entitled to other relief as the Court deems appropriate under this claim, including reasonable costs and attorney's fees, minus those already awarded by the Colorado courts.

## ELEVENTH CLAIM FOR RELIEF
## AGAINST DEFENDANT GREEN PLANET
## NEGLIGENCE

589.  This section incorporates by reference each of the prior allegations and paragraphs.

590.  The harm which Green Planet caused through negligence occurred in New Mexico.

591.  New Mexico's law will govern the actions that took place in that state.

592.  Green Planet had a duty of care to Mr. Fahrenbach in their actions at his residence in New Mexico.

593.  Green Planet violated that duty of care by having uncertified movers packing and loading his property.

594.  Green Planet's violations resulted in inefficient packing, which resulted in a higher price charged.

595.  Green Planet's violations violation resulted in Green Planet damaging the ditch and tree just outside of Mr. Fahrenbach's property, for which Mr. Fahrenbach may be held responsible by the homeowner's association.

596.  Trees are valuable in the New Mexico desert.

597.  Green Planet had a duty of care to Mr. Fahrenbach in their actions at his residence in Massachusetts.

598.  Green Planet violated that duty of care by driving his truck into the tree.

599.  That violation resulted in Green Planet damaging Mr. Fahrenbach's real property.

600.  Mr. Fahrenbach suffered damages as a result of these injuries in an amount to be proven at trial.

601.  Mr. Fahrenbach is entitled to other relief as the Court deems appropriate under this claim, including reasonable costs and attorney's fees.

**REQUEST FOR RELIEF**

Plaintiffs request the following legal and equitable relief:

a) Reimbursement of the amounts paid by Mr. Fahrenbach for items which were not his contractual obligation;

b) Reimbursement of the amounts paid by Mr. Fahrenbach over the Binding Moving Estimate;

c) Reimbursement for repairs, damage, or replacement to Mr. Fahrenbach's property, in an amount to be proven at trial;

d) Reimbursement of amounts paid by Mr. Fahrenbach for inefficient and improper work performed by Defendants;

e) Damages for Mr. Fahrenbach's time and effort which he expended as a result of the actions of Defendants, in an amount to be proven at trial;

f) Damages for the real property damage which Defendants caused and which third-parties may assess against Mr. Fahrenbach, in an amount to be proven at trial;

g) Damages for Mr. Fahrenbach's reliance on false statements, advertisement, and other deceptive practices of Defendants, in an amount to be proven at trial;

h) Mr. Fahrenbach's attorney fees and costs for the Colorado small claims court case;

i) Emotional and psychological damage based on the fear, distress, and stress caused to Mr. Fahrenbach, in an amount to be proven at trial;

j) Omitted pursuant to ECF 42;

k) An injunction preventing Perennial and Green Planet from continuing their deceptive and unfair trade practices;

l) All other damages resulting from the actions and inactions of Defendants, including consequential and incidental damages, in an amount to be proven at trial;

m) Statutory interest;

n) Attorney's fees and costs;

o) Omitted pursuant to ECF 42;

p) Punitive damages;

q) Other damages in an amount to be proven at trial; and

r) Any other relief the Court deems just and equitable.

**THE PLAINTIFF REQUESTS A JURY TRIAL.**

Dated: June 30, 2023

Respectfully submitted,

*/s/ Samantha Brown*
Samantha Brown, Esq., Co. #48709
Andrew Brown, Esq., Co. #48707
Polaris Law Group
11154 Huron Street Ste 207
Northglenn, CO 80234
Tel: (303) 557-6488
speaslee@lawpolaris.com
abrown@lawpolaris.com

James M. Vant (BBO #653616)
Greenberg Traurig LLP
One International Place, Suite 2000
Boston, Massachusetts 02110
Tel: (617) 310-6094
E-mail: james.vant@gtlaw.com

*Attorneys    for    Plaintiff    Ralf Fahrenbach*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2023, a copy of this First Amended Complaint, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Samantha S. Brown*

Samantha S. Brown